IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

```
CELTIC MAINTENANCE SERVICES, INC.,    )
                                       )
        Plaintiff,                     )
                                       )
    v.                                 )    CV 106-177
                                       )
GARRETT AVIATION SERVICES, LLC,        )
D/B/A LANDMARK AVIATION, and           )
GREENWOOD, INC.,                       )
                                       )
        Defendants.                    )
```

# O R D E R

The captioned matter is before the Court on Plaintiff's motion for partial summary judgment (doc. no. 83) and Defendants' motions for full summary judgment (doc. nos. 87 & 91). The Court heard oral argument on the motions on August 21, 2007.[1] Upon due consideration of the record evidence and the arguments of counsel, both oral and written, the parties' motions for summary judgment are **DENIED** for the reasons explained below.

## I. Background

On March 1, 2004, Defendant Garrett Aviation Services, LLC, doing business as Landmark Aviation, ("Garrett") and Plaintiff Celtic Maintenance Services, Inc. ("Celtic") entered into a two-year "Maintenance Service Agreement," under which Garrett paid Celtic to perform aviation maintenance at Bush

---

[1] Accordingly, Plaintiff's motion for oral argument (doc. no. 115) is **DENIED as MOOT**.

Field in Augusta, Georgia.[2]  The agreement contained the following clause:

### 6. NON-SOLICITATION

> Owner [Garrett] and contractor [Celtic] agree that during the term of this agreement and for a period of one year after the expiration of this agreement, neither party shall, directly or indirectly, solicit, hire, or contract for services with, any person employed by the other party without the written prior approval of the other party.

(Maintenance Service Agreement ¶ 6.)  The agreement also contained a "conversion" clause allowing for Garrett to hire Celtic's employees in exchange for a one-time fee "equal to one year's wages for each employee converted."  (Id. ¶ 7.)

In the months prior to the contract's expiration, Garrett asked Celtic to accept a one-year extension on the condition that Celtic would "remove the non-solicitation" provision. (J.M. Runnels Dep. at 83; see also Coley Dep. at 46.)  Celtic refused to do so.  Meanwhile, Garrett solicited bids for a new maintenance contract.  Defendant Greenwood, Inc. ("Greenwood") submitted a proposal which stated that Greenwood (if awarded the contract) would "transition[] the incumbent contractor's site personnel to Greenwood."[3]  (Pl.'s Statement of Facts ¶ 12

---

[2]The agreement actually renewed a previous two-year agreement.  Thus, Celtic performed maintenance services at Bush Field from 2002 until 2006. (J.M. Runnels Dep. at 58.)

[3]Greenwood contends this language was "boilerplate" and does not evince intent to violate or circumvent the non-recruitment agreement. (See Def. Greenwood's Statement of Facts ¶ 31.)  Nevertheless, Greenwood acknowledges that it was aware of the non-recruitment agreement before it hired the ex-Celtic employees.  (Id. ¶¶ 34-37.)

2

(citing Coley Dep. at 62; Hopkins Dep. at 58-59); Def. Garrett's Resp. to Pl.'s Statement of Facts ¶ 12 (admitting accuracy of Plaintiff's description of Greenwood's proposal).)

According to Celtic, David Coley ("Coley"), a Garrett employee, informed Celtic that, because Celtic had refused to drop the non-recruitment agreement, Garrett would use Greenwood as a "straw man" to circumvent the non-recruitment provision. (J.M. Runnels Dep. at 80-82, 136-38, 174, 244.) Coley also allegedly approached Celtic employees: (1) to encourage them to seek employment with Greenwood, and (2) to obtain detailed information regarding the employees' compensation and employment benefits. (Id. at 94, 143, 147, 220.)

Although Garrett admits that Coley kept the Celtic employees at Bush Field informed of the status of the bidding process, Garrett denies that Coley promised the Celtic employees employment with Greenwood, asked the employees about their compensation, encouraged the employees to seek employment with Greenwood, or specifically directed Greenwood to hire the Celtic employees. (See Bascino Dep. at 12-14; Coley Dep. at 31, 43-44.)

Nevertheless, Defendants agree that Coley specifically informed at least one of the Celtic employees that he "would have to interview for his own job if he wanted to keep that same job when Greenwood took over [the maintenance services]." (Def. Garrett's Statement of Facts ¶ 22.) Defendants also

admit: (1) Coley was aware of the Celtic employees' compensation and benefits, as well as their relevant experience and qualifications; (2) Coley informed Greenwood of many of these details; and (3) Greenwood and Garrett discussed the employment terms which Greenwood would later offer to each of the Celtic employees. (Coley Dep. at 32-35, 75-76, 88, 90-91, 114, 119-21; J.A. Hopkins Dep. at 28-29, 35, 39, 43-45, 72.) Garrett and Greenwood also had discussions regarding whether either party's conduct would violate the non-recruitment provision. (Coley Dep. at 107-08; J.A. Hopkins Dep. at 50, 72-73, 85.)

Finally, Coley informed Greenwood that Garrett was pleased with the work of the Celtic employees and wanted to keep them onsite. (Coley Continued Dep. at 39; Phillips Dep. at 15.) According to Greenwood, it understood that it was "reasonably important" to hire the Celtic employees. (J.A. Hopkins Dep. at 89.)

Ultimately, Greenwood offered three former Celtic employees jobs working for Greenwood at Bush Field.[4] In each instance, Greenwood offered an employment package which was superior to the employee's compensation under Celtic. All

---

[4] Defendants argue that these three employees were not employees of Celtic Maintenance, but of a sister corporation, Celtic Industrial Services, Inc. ("CIS"). (See, e.g., Def. Garrett's Resp. to Pl.'s Statement of Facts ¶ 18.) Both companies are fairly young: CIS was created in 1999, while Celtic was incorporated in 2002. (Runnels Dep. at 12-14.) Although CIS was used as a "common paymaster" for both companies, Celtic maintains that the two corporations are entirely separate business entities. (J.M. Runnels Continued Dep. at 13.)

4

three employees left Celtic to work for Greenwood. The loss of these employees effectively put Celtic out of business. (See J.M. Runnels Dep. at 15, 21, 147, 207-08.)

In essence, Celtic contends that Garrett violated the non-recruitment provision by directing Greenwood to raid Celtic employees. As to Greenwood, Celtic brings a claim for tortious interference with its contract with Garrett, alleging that Greenwood induced or conspired with Garrett to break the non-recruitment agreement. Of note, during their employment with Celtic, all three of these individuals were employed at-will with no written employment contract. Thus, the employees were not themselves subject to any restrictive covenant or non-competition agreement. (See, e.g., J.M. Runnels Dep. at 117.)

## II. Discussion

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Defendants contend that the non-recruitment provision which forms the basis of Plaintiff's suit is unenforceable as a matter of law. In the alternative, Defendants argue that Plaintiff's claims otherwise lack substantive merit. In contrast, Plaintiff argues that it is entitled to summary judgment on its claims against Garrett.

Georgia law recognizes "four basic types of restrictive covenants: noncompetition, nonsolicitation of customers,

5

nonrecruitment of employees, and nondisclosure of confidential information." Albany Bone & Joint Clinic, P.C. v. Hajek, 272 Ga. App. 464, 466, 612 S.E.2d 509, 512 (2005). These four types of restrictive covenants can be used in different contexts; such as ancillary to the sale of a business, a professional partnership agreement, or an employment contract. Georgia courts apply varying levels of scrutiny to restrictive covenants, depending upon the context in which the restrictive covenant is used. See, e.g., Palmer & Cay, Inc. v. Marsh & McLennan Co., Inc., 404 F.3d 1297, 1303-04 (11th Cir. 2005). At one end of the spectrum, "[a] covenant ancillary to the sale of a business" is subject to "a low level of scrutiny and may be blue-penciled[5] or reformed to bring it into conformance with Georgia law." Id. at 1303.

Similarly, restrictive covenants in professional partnership agreements are subject to "intermediate scrutiny because signatory partners hold relatively equal bargaining power, enjoy mutual advantage from the restrictive covenants, and share equally in the consideration." Id. at 1303 n.12 (citing Physician Specialists in Anesthesia, P.C. v. MacNeill, 246 Ga. App. 398, 539 S.E.2d 216, 221 (2000)). "These factors weigh in favor of the enforceability of restrictive covenants

---

[5] "If so-called "'sale of business' scrutiny applies, . . . [t]he blue pencil is simply a tool of severance . . . . It cannot rewrite the restrictive covenants, inserting clauses and providing sufficient limitations so as to render the restrictions reasonable and enforceable under Georgia law." Donovan v. Hobbs Group, LLC, 181 Fed. Appx. 782, 783 (11th Cir. 2006) (internal citations omitted).

6

in partnership agreements." MacNeill, 246 Ga. App. at 402, 539 S.E.2d at 221.

At the other end of the spectrum, "[r]estrictive covenants that are ancillary to an employment contract are subject to strict scrutiny and will be voided by Georgia courts if they impose an unreasonable restraint on trade." Stultz v. Safety & Compliance Mgmt., Inc., 285 Ga. App. 799, 801, 648 S.E.2d 129, 131 (2007). "Because Georgia does not utilize the 'blue pencil' doctrine of severability in this context, if any portion of the restrictive covenant is found unreasonable, 'the entire covenant must fall.'" Id. (quoting Uni-Worth Enters. v. Wilson, 244 Ga. 636, 640, 261 S.E.2d 572 (1979)). Of course, the Georgia Court of Appeals has noted that not every contract falls directly into one of these contexts. Swartz Inv., LLC v. Vion Pharm., Inc., 252 Ga. App. 365, 368, 556 S.E.2d 460, 463 (2001). In determining the applicable level of scrutiny, the Court should consider "the relative bargaining power of the parties" and "whether there is independent consideration for the restrictive covenant itself." Id. at 369, 556 S.E.2d at 463.

In the instant case, the non-recruitment provision is used in a context similar to that of a professional partnership agreement. First, Garrett and Celtic are corporations which employed attorneys in negotiating and drafting the Maintenance Service Agreement; consequently, in sharp contrast to the typical employment contract, there is no

issue of unequal bargaining power. Second, the non-recruitment provision is supported by independent consideration because it bound *both* Celtic and Garrett not to pirate each other's employees. Thus, the non-recruitment agreement, like a partnership agreement, benefitted both Celtic and Garrett by extracting "like restriction[s]" from each party.[6] See id. Consequently, the Court determines that the non-recruitment agreement is subject only to intermediate scrutiny.

The Court recognizes that the non-recruitment agreement had the ultimate effect of prohibiting Celtic's employees from obtaining employment at Garrett, and *vice versa*. In this regard, although the parties have described the agreement as a non-solicitation provision, the agreement is perhaps better characterized as a no-hire provision, because on its face it forbad the parties not only from active solicitation, but also from hiring any employee who left Celtic or Garrett's employ on his or her own. Accordingly, Defendants argue that, because the no-hire provision had the effect of limiting Celtic employees' ability to compete with Celtic without their knowledge or consent, the agreement should be subjected to heightened scrutiny. See Heyde Co., Inc. v. Dove Healthcare, LLC, 258 Wis.2d 28, 40-41, 654 N.W.2d 830, 836 (2002)

---

[6] Defendants correctly point out that the "conversion" clause, described *supra*, applied only to Celtic employees; however, such fact does not affect the validity of the non-solicitation clause, which mutually bound both Garrett and Celtic. The parties do not argue, and the Court does not address, whether the conversion clause is unenforceable.

(subjecting no-hire agreement to strict scrutiny because of its indirect effect upon employees).

Nevertheless, the Court declines to conclude that the no-hire provision is somehow tainted merely because there was "no corollary noncompetition agreement" with the Celtic employees.[7] See Ex parte Howell Eng'g & Surveying, Inc., __ Ala. __, __ So.2d __, 2006 WL 3692536, at *8 (2006). The provision's purpose was not to foreclose Celtic employees from competing or practicing their chosen trade or profession, but to prevent Garrett from poaching Celtic's workers and thereby rendering Celtic "'an involuntary and unpaid employment agency.'" See H & M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc., 209 Ill.2d 52, 64, 805 N.E.2d 1177, 1184 (2004) (quoting Therapy Servs., Inc. v. Crystal City Nursing Ctr., Inc., 239 Va. 385, 388, 389 S.E.2d 710, 712 (1990)).

---

[7] In this regard, the Court rejects Defendants' argument that the no-hire provision is invalid because it purports to bind Greenwood and ex-Celtic employees, who were not parties to the contract. For this premise, Defendants rely upon Szabo Food Serv., Inc. v. Cook County, 160 Ill. App.3d 845, 848, 513 N.E.2d 875, 877 (1987). In Szabo, the court held unenforceable Cook County's promise "not to 'permit former managerial employees of SZABO to be employed in COUNTY food service facilities'" because the provision prevented former Szabo employees from obtaining employment with unrelated third-parties who provided food services to Cook County. Id. However, Szabo is unpersuasive because, unlike the case *sub judice*, Szabo did not allege that Cook County was using a third party "as a surrogate to evade [a] restriction prohibiting the County from hiring Szabo's managers." Id., 160 Ill. App.3d at 849, 513 N.E.2d at 877. Furthermore, the instant no-hire provision, unlike the clause disapproved in Szabo, did not put an affirmative obligation upon Garrett to prevent its future business partners from independently employing ex-Celtic employees. The instant agreement only forbade Garrett from using "indirect" means to solicit or hire Celtic employees; it did not forbid Greenwood from hiring Celtic employees independent of Garrett's influence.

Put plainly, this is not a case in which an employee argues that he has been foreclosed from competing or obtaining employment. Cf. Howell, 2006 WL 3692536, at *8. Consequently, the instant no-hire provision cannot be fairly analogized to a restrictive covenant in an employment contract but rather, as explained *supra*, is used in a context more akin to a professional partnership agreement. In other words,

> [a]lthough the provision in question involves an employee's ability to secure future employment, it is neither a covenant not to compete nor a restrictive covenant between employer and employee. It is a contract between two businesses . . . . As part of the agreement, one party agrees to forego the ability to hire certain people who are not parties to the contract. As such, it is a contract in restraint of trade and will be held void as against public policy if it is unreasonable as between the parties or is injurious to the public.

Crystal City, 239 Va. at 388, 389 S.E.2d at 711.

In determining whether the no-hire provision was an unreasonable restraint of trade, the Court considers "its duration, territorial coverage, and scope of prohibited activity." MacNeill, 246 Ga. App. at 403-04, 539 S.E.2d at 222. In assessing the restrictive covenant's reasonableness, the Court must not only consider the face of the agreement, but must also take into account "the particular factual context" in which the agreement was made. See, e.g., Lighting Galleries, Inc. v. Drummond, 247 Ga. App. 124, 127, 543 S.E.2d 419, 422 (2000); see also Annis v. Tomberlin & Shelnutt Assocs., Inc., 195 Ga. App. 27, 30, 392 S.E.2d 717, 721 (1990).

10

The no-hire provision was admittedly broad, as its application was limited neither to a particular subset of employees nor to a particular geographic area. However, the absence of such explicit limitations is not always fatal, even in the employment context which is subject to higher scrutiny than the no-hire provision between two businesses in the case at bar. See, e.g., W.R. Grace & Co., Dearborn Div. v. Mouyal, 262 Ga. 464, 467, 422 S.E.2d 529, 533 (1992) (holding that "[r]equiring an express geographic territorial description in all cases is not in keeping with the reality of the modern business world").

More to the point, although Georgia courts have been quick to strike down broad non-competition agreements in employment contracts, broad non-recruitment and no-hire provisions are routinely enforced in Georgia. For example, in Lane Co. v. Taylor, 174 Ga. App. 356, 359-360, 330 S.E.2d 112, 114 (1985), the Georgia Court of Appeals concluded that a restrictive covenant which forbade a former employee from "[h]ir[ing] or attempt[ing] to hire for any other employer any employee of Employer or directly or indirectly cause any such employee to leave his employment in order to work for another" for a period of one year was reasonable.[8] Similarly, in

---

[8] See also Palmer & Cay of Georgia, Inc. v. Lockton Co., Inc., 273 Ga. App. 511, 514, 615 S.E.2d 752, 756 (2005) (enforcing employee's agreement not to "directly or indirectly, attempt in any manner to cause or otherwise encourage any employee of the Company to leave the employ of" the employer), rev'd in part on other grounds, 280 Ga. 479, 629 S.E.2d 800 (2006); Mathis v. Orkin Exterminating Co., Inc., 254 Ga. App. 335, 336, 562 S.E.2d 213, 214-15 (2002) (upholding anti-piracy clause in employment

11

MacNeill, 246 Ga. App. at 399, 539 S.E.2d at 219, the Georgia Court of Appeals upheld a no-hire provision which forbade shareholders in a professional corporation "from hiring or attempting to hire" any of the corporation's employees.[9] In arguing that the absence of language limiting the agreement's scope to a particular subset of employees or to a particular geographic area is fatal to the restrictive covenant,[10]

---

contract which forbade former employee from "[d]irectly or indirectly, alone or in any capacity, solicit[ing] or in any manner attempt[ing] to solicit or induce any person or persons employed by the Company or any parent, subsidiary or affiliated corporation to leave such employment"); Sanford v. RDA Consultants, 244 Ga. App. 308, 309, 535 S.E.2d 321 (2000) (enforcing employee's agreement "not to attempt to employ or assist any other person in employing or soliciting for employment any employee employed by RDA"); Sunstates Refrigerated Servs., Inc. v. Griffin, 215 Ga. App. 61, 61, 449 S.E.2d 858, 859 (1994) (enforcing former employee's promise not to "employ, attempt to employ or assist anyone else in employing as a manager, executive or salesperson in any competing business any of the [employer's] managerial, executive or sales personnel"); U3S Corp. of Am. v. Parker, 202 Ga. App. 374, 376, 414 S.E.2d 513, 515 (1991) (enforcing employee's promise not to "solicit or in any manner encourage employees of the Company to leave the employ of the Company" for a two year period with no specified geographic limitation); Harrison v. Sarah Coventry, Inc., 228 Ga. 169, 170, 184 S.E.2d 448 (1971) (upholding employee's promise not to "solicit or in any manner attempt to induce Sarah Coventry's salespeople or employees to leave the company").

[9]The Court recognizes Defendants' reliance upon Club Props., Inc. v. Atlanta Offices-Perimeter, Inc., 180 Ga. App. 352, 352, 348 S.E.2d 919, 920 (1986), as contrary authority. In Club Props., the Georgia Court of Appeals concluded that the following clause was unenforceable: "[S]hould Lessee offer employment to and subsequently employ any employee of Lessor who was an employee of Lessor at any time during the six month period immediately preceding the offer of such employment by Lessee, Lessee shall pay to Lessor as a procurement fee the sum of $5,000.00." Id. Although similar to the instant no-hire provision in many respects, the agreement in Club Props. was deemed unreasonable because it "contain[ed] no express reasonable limitation as to time of duration." Id. at 354, 348 S.E.2d at 922. In contrast, the instant no-hire provision contains an explicit one-year limitation, and Defendants do not argue that this limit was unreasonable.

[10]In this regard, Defendants rely chiefly upon Capricorn Sys., Inc. v. Pednekar, 248 Ga. App. 424, 426, 546 S.E.2d 554, 557 (2001), in which the Georgia Court of Appeals determined that a restrictive covenant in an employment contract which, *inter alia*, forbade the employee from soliciting "any employee" of the employer was unenforceable. Of note, Capricorn involved a restrictive covenant whose terms more broadly "prohibited [the employee] from working in any scope or capacity of employment for a competitor of the former employer." Id., 248 Ga. App. at

12

Defendants fail to distinguish the above-cited cases. Consequently, the Court concludes that the no-hire agreement is enforceable as a matter of law.

Having so concluded, the Court declines to award summary judgment to any party. First, there are material issues of fact regarding whether Garrett violated the no-hire provision by indirectly soliciting Celtic employees.[11] The Court likewise concludes that there is a genuine issue of fact regarding whether Greenwood tortiously interfered with the no-hire agreement.

The Georgia courts have indicated that "a claim can be made for actively inducing, conspiring with, or aiding and abetting a person to breach a restrictive covenant." Bijou Salon & Spa, LLC v. Kensington Enters., Inc., 283 Ga. App. 857, 862, 643 S.E.2d 531, 534-35 (2007) (citing Purcell v. Joyner, 231 Ga. 85, 88, 200 S.E.2d 363 (1973)). Here, Greenwood makes the intriguing argument that it could not have tortiously interfered with the contract because Garrett had already decided to end its dealings with Celtic before Garrett

---

426, 546 S.E.2d at 557. In contrast, the instant case involves a no-hire agreement between two businesses which foreclosed employees only from working for a single entity. More importantly, the Georgia Court of Appeals has explicitly rejected the notion that Capricorn stands for the proposition that a non-recruitment provision is necessarily overbroad merely because it forbids solicitation "regardless of the reason for the solicitation." Palmer, 273 Ga. App. at 515, 615 S.E.2d at 757. Simply put, Capricorn is inapposite.

[11] In this regard, the Court rejects Defendants' apparent argument that, because Garrett did not itself hire the ex-Celtic employees, the no-hire clause could not have been violated. (See, e.g., Coley Dep. at 52-55.) Such a conclusion would render the agreement's ban on "indirect" solicitation and hiring utterly meaningless.

and Greenwood had any contact. (Def. Greenwood's Mem. in Supp. of Summ. J. at 6-7.) Greenwood also maintains that, when Garrett set the bidding process in motion, it had already decided "to use a third company as a straw-man to warehouse Celtic's employees, in an effort to avoid the non-solicitation provisions." (Id. at 7.) In Greenwood's view, by hiring the ex-Celtic employees for itself, after business relations between Celtic and Garrett had already broken down, it could not have interfered with the contract. (Id. at 8.)

Although this argument may show that Greenwood did not "induce" Garrett's alleged breach, it does not address whether Greenwood conspired with or aided and abetted Garrett in its alleged effort to solicit and hire Celtic employees indirectly. At bottom, the parties dispute whether Greenwood was aware of and aided a plan by Garrett to raid Celtic's employees. Accordingly, the instant case is not appropriately resolved on summary judgment.

### III. Conclusion

For all of the foregoing reasons, the parties' cross-motions for summary judgment (doc. nos. 83, 87, & 91) are **DENIED**.

**ORDER ENTERED** at Augusta, Georgia, this 21 day of December, 2007.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE

14